J^FOIL, J.
This is an appeal by the defendants, Certain London Market Companies (the London Insurers), from a judgment in favor of the plaintiffs, Norfolk Southern Corporation, Norfolk Southern Railway Company, Norfolk and Western Railway Company, The Alabama Great Southern Railroad Company, Southern Region Industrial Realty, Inc., Central of Georgia Railroad Company, and The Cincinnati, New Orleans and Texas Pacific Railway Company (collectively Norfolk). This judgment was rendered on May 15, 2002, and concerns the issues of allocation/exhaustion stemming from the court’s previous finding of coverage under certain excess comprehensive general liability insurance policies subscribed to by the London Insurers from 1969 to 1986. Based on this court’s reversal of the trial court’s finding of coverage in Norfolk Southern Corp. v. California Union Ins. Co., 02-0370 (La.App. 1 Cir. 9/12/03), 853 So.2d 1141 (the coverage appeal), this appeal has been rendered moot and is hereby reversed.
As set forth in the coverage appeal, the background of this case is as follows. Norfolk filed this suit for declaratory judg *210 ment and for damages against the London Insurers seeking reimbursement for costs expended by Norfolk in remediating various environmental sites located throughout the United States, including the one at issue in this appeal.[1] The Southern Wood Piedmont site (the site) consists of a 33-acre tract and a nearby 17-acre tract located in Macon, Georgia. Central of Georgia Railway Company has owned the 33-acre tract since the early 1900s, and Southern Region Industrial Realty has owned the 17-acre tract since 1962.[2]
|3In 1913, Norfolk constructed a wood treating facility on the 33-acre tract in order to treat railroad ties for use in the construction of its tracks. Norfolk operated this facility from 1913 until approximately 1939. American Lumber and Treating Company then operated the facility from 1939 through 1942, after which Norfolk leased the plant to Southern Wood Preserving Company. This company and its successor entity, Southern Wood Piedmont Company (collectively SWPC), continued to operate the facility pursuant to a lease with Norfolk until SWPC shut down the facility at the end of February 1986.[3] By the time the facility was closed in 1986, the site had been used as a wood treating facility for approximately 72 years. Consistent with this usage, the site was contaminated with wood-preserving chemicals such as coal tar creosote and pentachloro-phenol in diesel oil (penta).
Pursuant to its lease agreements with Norfolk, SWPC was required to surrender possession of the site to Norfolk at the end of the lease “in as good condition as [the site] may have been in prior to the use and occupation thereof by [SWPC].” Furthermore, SWPC was required to comply with all federal, state, and municipal laws and regulations and to indemnify Norfolk for damages resulting from its failure to do so. SWPC also assumed all responsibility for the disposal of its industrial wastes and agreed not to permit any such wastes to enter any stream on the leased property or to enter the sewage disposal system. Finally, SWPC was bound to hold Norfolk harmless in connection with the disposal of its industrial wastes with regard to the claims of any tenant, adjacent tenant, landowner, or any other person. The leases did not, however, hold SWPC responsible for contamination caused prior to its use of the property.
In February 1986, representatives of Norfolk and SWPC met to discuss cleanup of the site and what contributions, if any, Norfolk should be required 14to provide to the cleanup efforts. No state or federal entity had mandated the remediation. Moreover, no third party had filed a lawsuit against Norfolk regarding any contamination originating from the site.[4]
*211 After negotiations, Norfolk and SWPC tentatively agreed to a private cost-sharing plan based upon the years each had operated the site as a wood-preserving facility. Pursuant to their letter agreement, SWPC was responsible for 43 of the 72 years the plant was in operation (1943-1986) or 60% of the costs, and Norfolk was responsible for 29 of the 72 years (1913-1942) or 40% of the costs.[5] In addition, SWPC agreed to assume all responsibility for the cleanup of penta at the site because Norfolk had only used creosote during its operation of the facility.[6] Moreover, SWPC assumed full responsibility for the cleanup of the 17-acre tract that Norfolk had not used while operating the facility.
Cleanup operations began on the site in August 1986 and were ongoing at the time of trial. SWPC supervised and paid for the costs associated with the cleanup, and Norfolk reimbursed SWPC periodically for 40% of the costs in accordance with the agreement. Norfolk alleged that it had incurred expenses totaling $5.1 million in accordance with the cost-sharing plan and sought to recover these costs from the London Insurers.
lsThe London Insurers provided insurance coverage to Norfolk pursuant to various policies in effect from 1969 to 1986. The issue of coverage regarding the site proceeded to jury trial in September 2000. The jury ultimately returned a verdict finding that $3 million of Norfolk’s expenses were covered under the insurance policies. A judgment in accordance with this verdict was signed on October 2, 2000. The London Insurers filed a suspensive appeal from that coverage judgment, which was addressed in Norfolk Southern Corp. v. California Union Ins. Co., 02-0370 (La.App. 1 Cir. 9/12/03), 853 So.2d 1141. In that ease, this court reversed the trial court’s judgment, finding there is no coverage under the policies at issue because Norfolk did not pay the sums it sought to recover “as damages.” Rather, the payments were made pursuant to a private cost-sharing agreement. Because we have found no coverage under the facts of this case, the issues raised in this appeal dealing with allocation/exhaustion are rendered moot.
For these reasons, the judgment of the trial court rendered on May 15, 2002, is hereby reversed as being moot. Costs of this appeal are assessed to Norfolk.
REVERSED AS MOOT.

. In its original and amending petitions, Norfolk named numerous non-London market insurance companies as defendants in addition to the London Insurers. At the time of trial, however, the London Insurers were the only defendants remaining in the lawsuit.

. Both entities are named plaintiffs and wholly-owned subsidiaries of plaintiff, Norfolk Southern Corporation. For purposes of this appeal, we will refer to the plaintiffs collectively as Norfolk regardless of the specific entity involved.

. In. 1972, Norfolk sold the equipment on the 33-acre tract to SWPC but retained ownership of the underlying land. SWPC had leased the 17-acre tract from a third party from 1942 to 1962, when Norfolk purchased the tract and leased it back to SWPC. The smaller tract was used primarily as a pole storage yard by SWPC.

. In 1991, Norfolk notified the London Insurers of the cleanup operations. At that time, SWPC had been named as a defendant in a toxic tort and CERCLA suit by a third party regarding this contamination, but Norfolk had not. There is no evidence that Norfolk *211 was ever named in that lawsuit, and no evidence of the result of the suit against SWPC has been filed of record. There is also no evidence in the record that Norfolk was required to take any action regarding those claims.

. Norfolk's operation of the facility ceased in 1939. American Lumber and Treating Company operated the plant between 1939 and 1942; however, this company was not involved in the cost-sharing agreement.

. Norfolk did share in the costs of removing penta to the extent that the removal or remediation of creosote would simultaneously cause the removal or remediation of penta at no extra cost to Norfolk.